TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN








NO. 03-04-00451-CV






Arnell Ronald Manning, Jr., Appellant


v.


Texas Department of Family and Protective Services, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT

NO. FM3-00781, HONORABLE CHARLES CAMPBELL, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N




 This is an appeal from a final order terminating appellant Arnell Manning's parental
rights to a child, J.M., he fathered with Lynell Phelps. (1) See Tex. Fam. Code Ann. § 161.001(1), (2)
(West 2002). J.M. and seven other children of Phelps were removed after the eighth child was found
to have cocaine in her system at birth. Manning, the only party on appeal, presents nine issues
including due process deprivations, violation of section 107.013 of the family code, and ineffective
assistance of counsel related to a ten-month delay in appointment of his trial attorney; erroneous use
of a broad-form submission of termination grounds; legal and factual insufficiency of the evidence;
failure to remove the attorney ad litem and guardian ad litem for failure to perform statutory duties;
and failure to disqualify the attorney ad litem due to an alleged conflict of interest. We will affirm
the decree of the trial court.


BACKGROUND


 Lynell Phelps met Arnell Manning in October 1997 while they were in different drug
treatment programs. (2) In March 1998, Manning was arrested for possession of cocaine and placed
on deferred adjudication. See Tex. Health & Safety Code Ann. § 481.115 (West 2003). Manning
and Phelps began living together in the summer of 1998. J.M. was born in February 1999 with
cocaine in her system. At the termination trial, Phelps testified that Manning purchased cocaine for
her and smoked it with her while she was pregnant with J.M. Although Manning testified he was
unaware that Phelps used cocaine and denied that he used cocaine with her, he was arrested in March
1999 for possession of a controlled substance, dihydrocodeine. At the time of arrest, Manning had
with him J.M., who was then one month old. The arresting officer testified that Manning smelled
of alcohol and possessed pills, a crack pipe, and a diaper bag with nothing in it other than liquor. 
After Manning was released from jail in June 1999, he did not return to J.M. and Phelps but instead
went to live with his mother in Chicago. In August 1999, Phelps and three of her children, including
J.M., moved to Chicago to live with Manning and his mother. Manning returned to Texas alone in
December or January 2000. Phelps and the children returned in late January. Manning's last contact
with Phelps or J.M. was in April 2000, when J.M. was 14 months old. (3)

 When Manning returned to Texas in January 2000, he was arrested and sentenced to
ten days in jail for a 1998 theft by check. See Tex. Pen. Code Ann. § 31.03 (West 2003 & Supp.
2004-05). He was released to a drug rehabilitation program but did not complete the program. In
August 2000, he was arrested and subsequently pleaded guilty to possession of a controlled
substance. In January 2002, Manning was convicted of robbery after being arrested when an officer
saw him holding a scalpel to the throat of another man. See Tex. Pen. Code Ann. § 29.02 (West
2003).

 The Department received at least ten referrals regarding Phelps and her children
between October 1992 and October 2002. In October 2002, the Department received a referral
alleging physical neglect of Phelps's then-seven children, including J.M. The referral also included
allegations of neglectful supervision of J.M. and another sibling. Phelps was allegedly using crack
cocaine, and her home was filthy. At a subsequent visit, the house was cleaned up, and Phelps later
passed a drug test. The Department received additional referrals on four different occasions in
January 2003, and again on February 3, 2003, reporting that the children had lice and ringworm. 
Additionally, one of J.M.'s siblings alleged physical abuse by another adult living in the home. These proceedings were initiated in February 2003 after the Department was notified
that Phelps's newborn eighth child had tested positive for cocaine. The Department filed its original
petition on February 3, 2003, seeking termination of parental rights to Phelps's eight children. The
petition lists Manning as the alleged father of J.M. (4) The petition also includes a "Notice of Right
to Counsel." The notice states that 

If you are indigent and wish to oppose Petitioner's action, you should appear at the
above indicated hearing prepared to show proof to the Court of your indigency and
inability to hire an attorney. If you cannot appear at the hearing you should notify the
District Clerk at the County Courthouse that you wish to have a court-appointed
attorney.



Manning was still incarcerated at the time he received the original petition. On February 24, 2003,
the trial court signed an order approving temporary removal of the children and appointing attorneys
for both Phelps and another man involved in the termination proceedings.

 Manning first requested a court-appointed attorney on February 26. In a letter to the
district clerk, Manning stated that he was the incarcerated father of J.M. and requested legal custody
and a court-appointed attorney. (5) No attorney was appointed at that time. On March 28, the court
held a status hearing. The court found, among other things, that Manning "has reviewed and does
understand the service plan." (6) On April 29, 2003, the case was set for trial on the merits in August
of that year. The Department filed an amended petition on May 22. On June 12, in response to the
amended petition, Manning sent the district clerk another request for a court-appointed attorney. On
June 24, by letter to the district clerk, Manning's mother requested custody of J.M. and a court-appointed attorney for Manning. On August 11, 2003, the district court granted a motion for
continuance filed by Phelps and another respondent father. On December 9, the Department filed
a motion requesting that the trial court extend the dismissal date by 180 days because it "recently"
became aware that Manning had filed an answer and requested a court-appointed attorney. The
Department requested that the district court find Manning indigent and appoint an attorney for him. 
On December 15, the district court granted the motion to appoint Manning an attorney and extended
the dismissal date by 180 days. However, the attorney was not appointed until January 2004, almost
a year after Manning had first requested one from "the District Clerk at the County Courthouse,"
pursuant to the instructions he had received.

 Manning was released from prison on January 31, 2004. Two days later, he appeared
in court for his "Emergency Motion to Appoint Respondent [Manning] Permanency Managing
Conservator" and signed a family service plan. Manning did not see J.M. at that time because he
allegedly planned to return to Chicago to visit his mother that day. However, on February 5, only
three days after signing the service plan and requesting managing conservatorship of J.M., Manning
committed theft in Travis County, was arrested again, and subsequently pleaded guilty. (7) See Tex.
Pen. Code Ann. § 31.03. 

 At a pre-trial hearing, Manning was adjudicated to be the father of J.M. The
termination trial was to a jury; Phelps testified that throughout their relationship, Manning was
physically abusive to both her and J.M. and that he drank, smoked crack cocaine, and stole from his
mother to support his drug habit. (8) Manning testified about his criminal history and claimed to have
been rehabilitated from narcotics and alcohol abuse. He also conceded that he did not think he had
been a good father to J.M. Thomas Wasden, a supervisor at Child Protective Services, testified that
he believed Manning had endangered J.M. and that it would not be in the best interest of J.M. to live
with Manning's mother.

 The issue of termination was submitted in a single broad-form question in which the
jury was instructed regarding two statutory grounds for termination--endangerment and
abandonment--and best interest. Tex. Fam. Code Ann. §§ 161.001 (1)(D), (E) (N), (2) (West 2002);
see Taylor v. Texas Dep't of Protective and Regulatory Servs., No. 03-03-00467-CV, 2005 Tex.
App. LEXIS 1793, at *12 (Tex. App.--Austin March 10, 2005, no pet.); Comm. on Pattern Jury
Charges, State Bar of Tex., Texas Pattern Jury Charges: Family PJC 218.1B (2003). The jury found
that Manning's parental rights to J.M. should be terminated. Answering the second question, the
jury found that Manning's mother should not be appointed managing conservator. The district court
then entered an order terminating Manning's parental rights to J.M. and denying Manning's mother
managing conservatorship of J.M. This appeal follows.


DISCUSSION


 In Manning's first three issues, he complains that the ten-month delay in appointing
his trial attorney violated his statutory and constitutional rights, or constituted ineffective assistance
of counsel. In his fourth issue, he argues that the trial court erred by submitting the issue of whether
his parental rights should be terminated in broad form. In his fifth and sixth issues, Manning asserts
that the evidence is legally and factually insufficient to support the termination of his parental rights. 
Manning argues in his seventh and eighth issues that the trial court erred by failing to remove both
the attorney ad litem and guardian ad litem for statutory violations. Finally, in his ninth issue,
Manning argues that the trial court erred by denying his motion to disqualify the attorney ad litem
in light of an alleged conflict of interest in his dual representation of J.M. and another sibling.


Delay in appointment of attorney

 In Manning's first issue, he complains that the trial court violated his statutory rights
because it did not appoint him an attorney until ten months after his first written request and five
months before trial on the merits. See Tex. Fam. Code Ann. § 107.013 (West 2002 & Supp. 2004-05). Texas law requires a court-appointed attorney for indigent parents opposing the termination of
their parental rights. Id.; see also id. § 107.011 (West 2002 & Supp. 2004-05) (requiring
appointment of guardian ad litem for child "immediately after the filing of the petition, but before
the full adversary hearing"); 107.012 (requiring appointment of attorney ad litem for child
"immediately after the filing, but before the full adversary hearing, to ensure adequate representation
of the child"). The legislature did not mandate a specific deadline for the appointment of an attorney
for the parent, and the timing of the appointment of counsel is left to the trial court's discretion. See
Salinas v. Texas Dep't of Protective & Regulatory Servs., No. 03-04-00065-CV, 2004 Tex. App.
LEXIS 7640, at *9-10 (Tex. App.--Austin August 26, 2004, no pet.) (not designated for
publication); see also In re J.M.C., 109 S.W.3d 591, 598 (Tex. App.--Fort Worth 2003, no pet.);
In re J.R.P., 55 S.W.3d 147, 149-50 (Tex. App.--Corpus Christi 2001, pet. denied). Because an
attorney was appointed pursuant to section 107.013, there was no statutory violation. See Tex. Fam.
Code Ann. § 107.013. We overrule Manning's first issue.

 In his second and third issues, (9) Manning argues that due process violations, or a
structural error, occurred because it was fundamentally unfair that hearings were held at "critical
stages" without the appointment of an attorney despite his repeated requests. See Gardner v.
Florida, 430 U.S. 349, 358 (1977); Fuller v. State, 829 S.W.2d 548, 553 (Tex. Crim. App. 1993). 
Alternatively, he alleges that the late appointment resulted in ineffective assistance of counsel. See
U.S. Const. amends. V, VI, XIV, § 2. Federal due-process rights do not always require a court-appointed attorney for indigent parents in parental-termination proceedings. Lassiter v. Department
of Soc. Servs., 452 U.S. 18, 31-32 (1981). Instead, due process requires the application of
"fundamental fairness," which depends on the facts of each particular situation. (10) Id. at 24-25; see
M.L.B. v. S.L.J., 519 U.S. 102, 117 (1996) (appointment due when warranted by character and
difficulty of case). Moreover, even if due process were implicated in this case, the error must be
deemed harmful for the order to be reversed on appeal. Arizona v. Fulminante, 499 U.S. 279 (1991);
In re M.S., 115 S.W.3d 534, 549-50 (Tex. 2003) (ineffective assistance claim subject to "harmless
error" analysis); see In re K.R., 63 S.W.3d 796, 800 (Tex. 2001) (error in shackling incarcerated
father during parental termination trial subject to "harmless error" analysis); see also Tex. R. App.
P. 44.1.

 The timing of the attorney's appointment in relation to Manning's two requests is
problematic. Initially, Manning could not appear at the hearing to contest the termination due to his

 incarceration. (11) The termination petition was filed February 3, 2003, and sent via certified mail to
Manning. Manning's first request for an attorney was dated February 21 and filed by the district
clerk on February 26. As directed by the Department, his letter was addressed to the district clerk
and specifically requested a court-appointed attorney. Manning again requested an attorney in a
letter sent to the district clerk, filed June 12. Finally, on June 20, Manning's mother sent a letter
requesting an attorney for him to a deputy district clerk. The letter was file stamped June 24. The
Department's attorney told the trial court that she "had no knowledge of this letter until August when
I pulled the district clerk's file." However, the Department did not request an attorney for Manning
until December 15. His court-appointed trial attorney, who is also his attorney on appeal, filed an
answer on his behalf in January 2004.

 Assuming without deciding that the delay in this case constituted fundamental
unfairness, (12) we find that any error was harmless. Although the delay lasted almost a year after his
initial request, his appointed attorney still had five months to prepare for trial. In those five months,
she represented Manning at hearings, served several discovery requests, and filed more than twelve
motions, including a motion for continuance. In the written motion for continuance filed May 10,
2004, Manning did not argue that the trial should be continued due to the delay in appointment of
his attorney. Rather, the continuance was based on the timing of the Department's supplementation
of the record and discovery responses. The continuance was granted, and trial was delayed by
approximately one month.

 Furthermore, although Manning asserts harmful error because he did not have counsel
present to argue that J.M. should be placed with Manning's mother, the record indicates that both
the district court and the Department were made aware that his mother was interested in having
custody of J.M. Manning's mother participated in a home study and intervened in the trial court. 
She did not, however, appear at trial (13) or appeal the jury's finding that she should not be appointed
managing conservator of J.M. 

 Moreover, Manning claims that the absence of a court-appointed attorney, after his
request, in the initial hearings regarding the placement of J.M. constituted ineffective assistance of
counsel. See In re M.S., 115 S.W.3d at 544-45 (right to effective assistance of counsel in
parental-rights termination proceedings) (citing Strickland v. Washington, 466 U.S. 668 (1984)). 
Assuming without deciding that Manning is correct, the error was harmless in this case. First,
Manning had the burden of proof to show that the absence of an attorney in the early stages of the
termination process prejudiced his case. See id. Manning's only claim of harm or prejudice relates
to the absence of an attorney to advocate his position that J.M. should have been placed with
Manning's mother. However, Manning had the benefit of an attorney to argue that Manning's
mother should be granted some type of custody. (14) The Department, the trial court, and the jury all
considered whether J.M. should be placed with Manning's mother and they explicitly found that the
best interest of J.M. would be served by terminating Manning's rights and placing J.M. in a different
home. Manning's attorney filed several pleadings, served requests for discovery, set hearings,
requested the appointment of an expert, and was even granted second chair counsel. (15) Several
hearings were held where Manning was represented by counsel, and he had the opportunity to fully
present his case, including his request to appoint either him or his mother permanent managing
conservator. (16) Considering the zealous efforts Manning's attorney undertook on his behalf and the
fact that all parties were aware of the possibility of placing J.M. with Manning's mother, the delayed
provision of counsel was not harmful error. We overrule Manning's second and third issues.

Broad form submission of termination issue

 In his fourth issue, Manning challenges the district court's submission of the
termination issue to the jury. Specifically, he complains that the court submitted multiple statutory 
grounds for termination in a single question. Manning urges that the broad-form submission enabled
the jury to find that his parental rights should be terminated even if less than the requisite ten jurors 
agreed as to any one statutory termination ground. He asserts that this result violates state and
federal law regarding the Department's burden of proof and his right to appeal the jury finding. See
In re C.H., 89 S.W.3d 17, 25 (Tex. 2002); but see Texas Dep't of Human Servs. v. E.B., 802 S.W.2d
647, 649 (Tex. 1990). The supreme court has approved this exact form of submission in termination
cases. E.B., 802 S.W.2d at 649. We have noted that E.B. was decided in 1990, before the supreme
court's more recent jurisprudence limiting the submission of valid and invalid liability theories in
a single broad-form question. Taylor, 2005 Tex. App. LEXIS, at *12; see Crown Life Ins. Co. v.
Casteel, 22 S.W.3d 378, 387-90, (Tex. 2000); see also Harris County v. Smith, 96 S.W.3d 230,
232-34 (Tex. 2002) (Casteel error to submit, in single question, multiple damage elements, some of
which are not supported by evidence). However, we are compelled to follow E.B., which squarely
addresses the issue before us, unless and until the supreme court holds otherwise. We overrule
Manning's fourth issue.


Sufficiency of the evidence

 In his fifth and sixth issues, Manning challenges the legal and factual sufficiency of
the evidence supporting the jury's findings of termination on the basis that he either knowingly
placed or allowed J.M. to remain in conditions or surroundings that endangered her well-being or
knowingly allowed her to remain with persons who engaged in conduct that endangered her. See
Tex. Fam. Code Ann. § 161.001(1)(D), (E). 

 The court was authorized to terminate Manning's parental rights if the Department
proved and the court found that (1) Manning engaged in conduct constituting a statutory ground for
termination and (2) termination was in the child's best interests. See Tex. Fam. Code Ann.
§ 161.001; In re C.H., 89 S.W.3d at 23 (Tex. 2002); Taylor, 2005 Tex. App. LEXIS 1793, at *7.
Although several statutory grounds for termination were submitted to the jury, the Department was
required to establish only one to satisfy the first element of the termination standard. See Green v.
Texas Dep't of Protective & Regulatory Servs., 25 S.W.3d 213, 219 (Tex. App.--El Paso 2000, no
pet.); In re J.M.T., 39 S.W.3d 234, 237 (Tex. App.--Waco 1999, no pet.); In re D.G., 5 S.W.3d 769,
771 (Tex. App.--San Antonio 1999, no pet.). To terminate parental rights, the Department must
prove each element by clear and convincing evidence. "Clear and convincing" evidence is that
degree of proof which will produce in the mind of the trier of fact a firm belief or conviction in the
truth of the allegations supporting termination. Tex. Fam. Code Ann. § 101.007 (West 2002); In re
C.H., 89 S.W.3d at 23 (quoting State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979)). 

 In reviewing the legal sufficiency of the evidence under the clear and convincing
standard, we consider all of the evidence in the light most favorable to the finding and determine
whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was
true. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). We review the factual sufficiency of the
evidence under the clear and convincing standard by viewing all of the evidence and determining
whether a reasonable fact-finder could have resolved disputed evidence in favor of its finding. Id.
If the disputed evidence is such that a reasonable fact-finder could have formed a firm belief as to
the truth of the Department's allegations, the evidence is factually sufficient. Id.; In re C.H., 89
S.W.3d at 25. These standards of review maintain the appropriate deference to the fact-finder's role
by assuming that it resolved evidentiary conflicts in favor of its finding when it was reasonable to
do so and by disregarding evidence that it could have disbelieved. In re J.F.C., 96 S.W.3d at 266-67.


 Termination grounds

 To prove endangerment under subsection D, the Department had to prove that
Manning (1) knowingly (2) placed or allowed J.M. to remain (3) in conditions or surroundings that
endangered her physical or emotional well-being. Id. § 161.001(1)(D). The degree of endangerment
required for involuntary termination is "more than a threat of metaphysical injury or the possible ill
effects of a less-than-ideal family environment," but the child does not need to suffer actual physical
injury. In re M.C., 917 S.W.2d 268, 269 (Tex. 1996); Texas Dep't of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987). Instead, "endanger" means to"expose to loss or injury; to jeopardize."
Boyd, 727 S.W.2d at 533. Moreover, the parent need not have actual knowledge of an injury or
certain knowledge that an injury to the child will result; it is enough that the parent is aware of the
potential danger to the child and that the parent disregards the risk. In re S.G.S., 130 S.W.3d 223,
238 (Tex. App.--Beaumont 2004, no pet.). 

 Under subsection E, the Department had to prove that Manning (1) engaged in
conduct or knowingly placed J.M. with persons who engaged in conduct (2) which endangered her
physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(1)(E). Under subsection D, the
danger to the child results from the child's environment, but under subsection E the parent's conduct
is the source of the danger to the child. In re D.C., 128 S.W.3d 707, 715 (Tex. App.--Fort Worth
2004, no pet.); Robinson v. Texas Dep't of Protective & Regulatory Servs., 89 S.W.3d 679, 686 (Tex.
App.--Houston [1st Dist.] 2002, no pet.). (17) 

 Imprisonment alone does not constitute engaging in conduct which endangers the
emotional or physical well-being of a child. See Boyd, 727 S.W.2d at 533-34. However, a parent's
repeated criminal acts may constitute sufficient evidence of conduct that endangers the well-being
of a child. In re J.N.R., 982 S.W.2d 137, 143 (Tex. App.--Houston [1st Dist.] 1998, no pet.),
disapproved on other grounds by In re C.H., 89 S.W.3d at 24-25; see also Tex. Fam. Code Ann
§ 161.001(1)(E); In re A.W.T., 61 S.W.3d 87, 89 (Tex. App.--Amarillo 2001, no pet.). Illegal drug
use in the child's household constitutes surroundings that endanger the well-being of the child under
subsection D. In re D.C., 128 S.W.3d at 715-16; In re S.D., 980 S.W.2d 758 (Tex. App.--San
Antonio 1998, pet. denied). Violent or abusive conduct by someone within the household also
constitutes an environment that endangers children. In re K.A.S., 131 S.W.3d 215, 222 (Tex.
App.--Fort Worth 2004, pet. denied); In re D.C., 128 S.W.3d at 715; Director of Dallas County
Child Protective Servs. Unit v. Bowling, 833 S.W.2d 730, 733 (Tex. App.--Dallas 1992, no writ). 
If the evidence, including the imprisonment, shows a course of conduct that has the effect of
endangering the physical or emotional well-being of the child, it can support a finding of
endangerment. See Boyd, 727 S.W.2d at 534.

 Phelps testified that Manning repeatedly physically abused both her and J.M. and that
he "is a danger to a lot of people, not just to" J.M. (18) Manning's criminal history is well documented,
including the fact that he was arrested once while with J.M., and once only a few days after signing
the family service plan. In the first five years and four months of J.M.'s life, Manning was
incarcerated for two years and four months. In January 2000, Manning entered a drug rehabilitation
center "to continue recovery." (19) The last time Manning saw J.M. was April 2000. Although
Manning introduced evidence that he has completed rehabilitation programs, the jury found that his
rights should be terminated. The jury could have reasonably formed a firm conviction or belief that
Manning's actions constituted endangerment. See id. Furthermore, the jury could have resolved the
disputed evidence in favor of the Department and formed a firm belief that the finding of
endangerment was true. Because we have found the evidence legally and factually sufficient to
sustain the termination on the statutory ground of endangerment, we need not reach the issue of
abandonment. See Schexnider v. Texas Dep't of Family & Protective Servs., No. 03-03-00298-CV,
2005 Tex. App. LEXIS 2648, at *10 (Tex. App.--Austin April 7, 2005, no pet. h.) (memo op.)


 Best interest of J.M.

 Next, Manning challenges the finding that termination of his rights was in the best
interest of J.M. Some of the common factors used to evaluate the best interests of a child are: (1)
the emotional and physical needs of the child now and in the future; (2) any emotional and physical
danger to the child now and in the future; (3) the parental abilities of the individuals seeking custody;
(4) the programs available to assist those individuals to promote the best interest of the child; (5) the
plans for the child by those individuals or by the agency seeking custody; (6) the stability of the
home or proposed placement; (7) the acts or omissions of the parent which may indicate that the
existing parent-child relationship is not a proper one; and (8) any excuse for the acts or omissions
of the parent. See Holley v. Adams, 544 S.W.2d 367, 372 (Tex. 1976); Leal v. Texas Dep't of
Protective & Regulatory Servs., 25 S.W.3d 315, 321 (Tex. App.--Austin 2000, no pet.); Taylor,
2005 Tex. App. LEXIS 1793, at *7-8. This is not an exhaustive list; other factors also may be
considered where appropriate. Holley, 544 S.W.2d at 372.

 Manning asserts that it would be in the best interest of J.M. to live with Manning's
mother. Thomas Wasden, Department supervisor, testified that the Department requested a home
study on Manning's mother in July 2003 and concluded that placement with her would not be in the
best interest of J.M. Specifically, Manning's mother was not aware of why her son was in prison
or of the circumstances that led to removal of the children from the home. Furthermore, Wasden was
concerned that the mother may have been aware of domestic violence and alleged drug use when
Manning and Phelps lived with his mother in Chicago but did not report that to anyone or follow up
to ensure J.M.'s safety. Finally, Wasden testified that J.M. had a strong bond with another sibling
and it would be in J.M.'s best interest to be close to that sibling in Texas rather than with a
grandparent she never knew in Chicago. (20) The jury could have reasonably formed a firm conviction
or belief that terminating Manning's parental rights was in J.M.'s best interest and resolved the
disputed evidence in favor of the Department. See In re C.H., 89 S.W.3d 17, 27 (Tex. 2002). We
overrule Manning's fifth and sixth issues.


Removal or disqualification of the attorney ad litem and guardian ad litem

 In his seventh and eighth issues, Manning argues that the trial court erred in denying
his motion to remove the attorney ad litem and guardian ad litem based on their failure to sufficiently
interview him and his mother. (21) We review the denial of the motions to disqualify under an abuse
of discretion standard. See In re Chu, 134 S.W.3d 459, 465 (Tex. App.--Waco 2004, no pet.); In
re J.N.F., 116 S.W.3d 426, 437 (Tex. App.--Houston [14th Dist.] 2003, no pet.). A trial court
abuses its discretion when it acts without reference to any guiding rules or principles. Carpenter v.
Cimarron Hydrocarbons Corp., 98 S.W.3d 682, 687 (Tex. 2002). An appellate court may reverse
a trial court for abuse of discretion only if, after searching the record, it is clear that the trial court's
decision was arbitrary and unreasonable. Simon v. York Crane & Rigging Co., 739 S.W.2d 793, 795
(Tex. 1987). The complaining party has the burden of proof. Id.; see Englander Co. v. Kennedy,
428 S.W.2d 806, 807 (Tex. 1968). In the absence of proof in the record, there is a presumption that
the evidence before the trial judge was adequate to support the decision. Id.; see Mays v. Pierce, 281
S.W.2d 79 (1955). 

 The original petition in this case was filed in February 2003, when the procedure for
objection to and removal of an attorney ad litem was governed by former family code section
107.006. See Act of May 28, 1999, 76th Leg., R.S., ch. 1515, § 1, 1999 Tex. Gen. Laws 5237, 5237
(repealed 2003). Under the former provision, a party to the proceeding filed a written objection, and
upon a finding that the objection was justifiable, the judge ordered removal. See id. Former family
code section 107.014 required an attorney ad litem representing a child to interview all parties to the
suit and individuals with significant knowledge of the child's history and condition (22) within a
reasonable time after the appointment. See id. (current version at Tex. Fam. Code Ann §§ 107.002-.003 (West 2002 & Supp. 2004-05).

 The attorney ad litem notified Manning's attorney that he had not personally
interviewed Manning and offered to set up an interview. A student attorney ad litem spoke with
Manning about the case, and in a handwritten note sent with the response to the motion to disqualify,
the attorney ad litem offered to "further interview" Manning if requested. There is no indication that
Manning ever accepted that offer. We hold that the attorney ad litem performed his statutory duty
by interviewing Manning and offering to speak with him again. The trial court did not abuse its
discretion in denying the motion to remove the attorney ad litem. We overrule Manning's seventh
issue.

 Similarly, Manning testified that he spoke with the guardian ad litem, CASA
Supervisor Kerri Smith. In an affidavit, Smith stated that she interviewed Manning in the presence
of his attorney and explained her role in the case at the courthouse following a scheduled hearing. 
Smith and Manning discussed topics such as his living arrangements and if he planned to meet the
caseworker to discuss the service plan. Manning told Smith that he planned to move to Chicago, and
Smith provided him with her business card and told him to call if he had questions. Manning stated
that he understood and would call if he had questions. Furthermore, the guardian ad litem testified
regarding conversations with Manning's mother. In light of evidence that Manning and his mother
were interviewed by the guardian ad litem, the trial court did not abuse its discretion by refusing to
remove her. We overrule Manning's eighth issue.

 In his ninth issue, Manning argues that the trial court erred by failing to disqualify the
attorney ad litem due to an alleged conflict of interest arising from his dual representation of J.M.
and another sibling because J.M. had family requesting custody, while the other sibling did not. In
the alternative, Manning asserts that the dual representation was ineffective assistance of counsel. 
Disqualification is a severe remedy which should not be granted based on mere allegations of
unethical conduct or a remote possibility of violation of the disciplinary rules. See In re Sanders,
153 S.W.3d 54, 57 (Tex. 2004). Even if a disciplinary rule was violated, Manning must demonstrate
that the attorney ad litem's conduct caused actual prejudice that requires disqualification. In re
B.L.D., 113 S.W.3d 340, 347 (Tex. 2003). We review a trial court's determination of whether there
was a conflict of interest for an abuse of discretion. Id.; see Metro. Life Ins. Co. v. Syntek Fin. Corp.,
881 S.W.2d 319, 321 (Tex. 1994). Standing alone, the fact that J.M.'s family is involved in this suit
while the other sibling's father is unidentified does not show actual prejudice caused by the dual
representation. Manning offers no evidence of prejudice to support his claim. The trial court did
not abuse its discretion in refusing to disqualify the attorney ad litem. We overrule Manning's ninth
issue.

CONCLUSION

 Having overruled Manning's issues on appeal, we affirm the decree of termination. 



 

 Bob Pemberton, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed: May 12, 2005

1. The Department originally brought this action to terminate the parental rights of Phelps,as
to all eight of her children; Manning, as the father of J.M.; and three other men who were fathers of
the other children. Phelps first agreed to permanent placement of the three oldest children in another
home. Subsequently, Phelps voluntarily relinquished her rights to J.M. and the four other remaining
children on the second day of trial. Manning does not assert any rights to Phelps's other children.
2. The Department began receiving referrals related to Phelps and her children in 1992. 
Before J.M.'s birth, Phelps had been arrested five times for other alleged crimes.
3. J.M. was over four years old at the time of trial.
4. Manning was not the presumed father of J.M. because Phelps was married to another man
at the time J.M. was born. See Tex. Fam. Code Ann § 160.102 (West 2002).
5. Manning testified that he also sent a letter to the Department requesting that his mother be
given custody of J.M. However, the Department disputes receiving that letter.
6. Manning received four or five family service plans which he signed and returned to the
caseworker.
7. Manning was still incarcerated for this crime at the time of the termination trial, but
appeared to testify.
8. Manning denies that he was physically abusive to J.M. or Phelps.
9. Although they present discrete legal questions, the two issues were argued together.
10. If there was no constitutional error, it cannot be a structural error. See Neder v. United
States, 527 U.S. 1, 14 (1999) ("Under our cases, a constitutional error is either structural or it is
not."). 
11. The record establishes that all parties were aware that Manning was incarcerated. 
12. The trial judge admonished the Department that "ten months is just simply too long. And
that, frankly, borders on deprivation of due process that he [sic] being locked up that long and not
have an attorney appointed. Now, I think, given the nature of the case and the fact that you all
complied with all of the discovery that the law requires you to comply with, that they would not be
able to show harm in this case. But at some point, when you start talking about constitutional
deprivation, harm is going to be presumed."
13. There is conflicting evidence about whether her absence was due to indecisiveness,
financial restrictions, or health reasons.
14. Although one month before trial Manning's attorney served a pro se plea in intervention
for Manning's mother, the attorney stated at a hearing that she did not represent Manning's mother.
15. In the five months in which she represented Manning, Manning's attorney filed, among
other things, an emergency motion to place J.M. with Manning or his mother, supported by an
affidavit from his mother; an original answer; special exceptions; a reply to the Department's motion
to strike his special exceptions; a motion to appoint Manning's mother temporary managing
conservator with brief in support; a jury demand; a first amended original answer; a motion in
limine; requests for admissions; a motion for a county-funded consulting and/or testifying expert;
a motion for continuance; an amended motion in limine; another motion for continuance unrelated
to the timing of appointment; a motion to exclude evidence relating to a child other than J.M.;
motion for leave to serve interrogatories (with attached interrogatories and a request for production);
motion for appointment of second-chair counsel; addendum to Manning's motion in limine; motion
to remove attorney ad litem and guardian ad litem and reply to their responses; motion to disqualify
attorney ad litem; motion to leave to serve second request for production; a second amended original
answer; reply to the Department's motion to strike Manning's mother's plea in intervention; motion
for reconsideration of order striking discovery; motion to deem the Department's answers admitted;
motion for special instructions, proposed jury questions (including a granulated issue on
termination); and motion for new trial.
16. The district court held a permanency hearing March 26, 2004. Manning was represented
by counsel, and the district court found that the Department had "made reasonable efforts to finalize
the permanency plan in effect for the child."
17. See also Hernandez v. Texas Dep't of Protective & Regulatory Servs., No..
03-04-00284-CV, 2005 Tex. App. LEXIS 1815, at *19-20 (Tex. App.--Austin 2005, no pet.) (not
designated for publication).
18. Phelps testified that Manning choked her one month before J.M. was born, hit her in front
of other children, and that his subsequent physical abuse of J.M. left marks and bruises on J.M. 
Manning denied Phelps's claims in his testimony.
19. Manning testified that he did not actually have an active drug problem but lived at the
rehabilitation center for four to five months merely because it provided shelter and employment. 
20. J.M. and her sibling were placed in the same foster home.
21. The Department and attorney ad litem argue that Manning lacks standing to challenge the
attorney ad litem and guardian ad litem because the Department had temporary conservatorship. 
However, we do not reach that issue because we find that the trial court did not abuse its discretion
in refusing to remove or disqualify the ad litems. 
22. Manning argues that he and his mother had significant knowledge of J.M.'s history and
condition and should have been interviewed by the attorney ad litem and guardian ad litem. 
However, at the time of trial, neither Manning nor his mother had seen or otherwise had contact with
J.M. for over two years.